THE ORDINARY.
By the will of William S. Jessup, late of Newark, who died February 16th, 1873, his step-mother, then Adelia M. Jessup, now, through remarriage, Adelia M. Sherman, was appointed executrix, and also trustee for her two daughters. On her remarriage, she and her husband were, by separate orders of the orphans court of Essex county, required to give bond, according to the statute, in regard both to the executorship and the trusteeship. They failed to do so, and she was, consequently, by separate orders of that court, made in January, 1881, removed from office as executrix and as trustee, and George D.G. Moore appointed administratorcum testamento annexo and trustee in her stead, and she and her husband were directed forthwith to state and settle her accounts as executrix, and forthwith to pay and deliver to Mr. Moore, the administrator, the balance due, and the goods, chattels, effects and choses in action in their hands, or in the hands of either of them, and also to proceed at once to settle her accounts as trustee, and to deliver to Mr. Moore, the new trustee, immediately on demand, all goods and chattels, moneys and effects, and other assets which she or he might hold by virtue of her trusteeship and of their marriage, and forthwith, by deeds duly executed and acknowledged, and effectual in the law, to convey and transfer to the new trustee all lands and real estate, bonds, mortgages and other securities held by them or either of them in trust for, or *Page 251 
pertaining to the trust estate. Mrs. Sherman, on the 17th of January, 1881, before the making of those orders, filed her accounts as executrix and trustee, in which she charged herself with the amount of the inventory, $16,778.52, and also the amount of a note of George Minchin, and interest thereon, and claimed allowance for, among other things, $400 paid Quinby Young, July 3d, 1873, for the price of a phaeton made by them on the order of the testator; also (under date of October 3d, 1873) for the amount of an investment of $10,000 made by her on the bond and mortgage of Henry G. Cook, for which, the principal being unpaid, and the interest in arrear, she accepted from the mortgagor, under the advice of counsel, a deed for the property, and surrendered the bond. The deed was dated March 14th, 1878. She claimed allowance, also, for the amount, $2,000, of the loan to George Minchin, and a loan of $2,000 to Ebenezer Harrison on his promissory note. On the 12th of April, 1881, by deed of that date, she and her husband, pursuant to the direction of one of the before-mentioned orders, conveyed to Mr. Moore, as trustee, the above-mentioned premises conveyed to her by Cook. That property consists of ten lots on Belleville avenue, in Newark. Mr. Moore accepted the deed, and caused it to be recorded, and he still holds the title under it. Exceptions were filed to Mrs. Sherman's account by Mrs. Lanier, one of her daughters. They were referred to a master in chancery, who reported that the accountant should be charged with the price of the phaeton, which she had taken and used as her own, claiming that the testator ordered it for her and gave it to her. Also, that she should be charged with the amount of the loan to Harrison, with interest for two years and seven months, and the amount of the loan to Cook, with interest from October 3d, 1876, the date of the last payment of interest thereon, to January 3d, 1881, four years and three months, and that the amount of the Minchin note should be disallowed. The accountant excepted to the report, and, on hearing, the orphans court, by its decretal order of January 30th, 1883, overruled the exceptions, and sustained the report, except as to the Minchin note, the amount of which the court held should be allowed to her, on the *Page 252 
ground that the money lent constituted part of the amount of the inventory. And the court also, by the same decretal order, ordered that Mr. Moore, the trustee, on being paid the amount charged against her for principal and interest on the loan secured by the Cook mortgage, convey the property back to her, or credit her with the net proceeds of those premises, on a fair sale thereof. It also ordered that the taxable costs of the exceptant, excluding the master's fees, and those of the stenographer in taking and preparing a transcript of the evidence before the master and the court, together with a counsel fee of $300 to the exceptant's counsel, be allowed out of the funds of the estate in the hands of Mr. Moore, the trustee, and be paid by him in the first instance, and that the amount so allowed and paid by him, excepting the counsel fee, be charged to the accountant, and by her paid, out of her private estate, to the trustee.
From so much of that order as charged her, Mrs. Sherman appealed to this court. Mrs. Lanier also appealed from that part of it which allowed to the accountant the amount of the Minchin note.
There is no error in the order under review so far as that note is concerned. The appeal in reference thereto was, in fact, abandoned on the hearing.
Nor is there error in the disallowance of the loan of $2,000 to Ebenezer Harrison. The money was, with $1,000 of her own funds, lent by Mrs. Sherman to Harrison upon his promissory note, without other security than a policy on his life for $3,000. He paid the premium on the policy for a few years, and then ceased, and she, as she says, feeling that she could not afford to pay the premiums, surrendered it in consideration of a paid-up policy of $525 issued to her instead of it. Harrison is insolvent. It was clearly a breach of her duty to invest on such security, and the money is wholly lost. She is therefore chargeable with it and the interest thereon. On paying the money and interest, she will, of course, be entitled to the note and policy.
She should be charged, also, with the price of the phaeton. She alleges that it was a gift to her from the testator; that it *Page 253 
was given to her in exchange for another one of hers which he had sold, and never accounted to her therefor in any way. It appears that the testator bought and paid for that carriage also She says he gave it to her. Nevertheless, he appears to have sold was his own and kept the proceeds. But whatever may have been her title to that carriage, she has not established a legal title to the one in question. She says the testator sold the other phaeton because it was too heavy for her horse (the horse belonged to her first husband's, the testator's, father's estate); that he promised to have one made for her in return for it; that he then ordered the carriage in question; that almost the last time he went out of the house, which was about three weeks before his death, he and she went to the carriage-makers' shop (Quinby 
Young's), and the carriage was then in the store-room there; that she thinks it was finished but not yet dry; that the testator and she both got into it and sat down and tried it; that as they had no place in which to keep it, the testator asked Mr. Young if he would keep it for her until the stable, which she was then building, should have been finished; or, as she afterwards states it, they did not want it and had no place in which to put it, and "it was talked of to Mr. Young that his firm should keep it until Spring." In the early part of her testimony she says that the carriage was not finished when the testator died (which was in February, 1873), and that it was not delivered by the carriage-makers until about the 29th of April following; but she afterwards testifies that when she and the testator went to look at it, it was lined and painted, but the paint was not yet dry, and that it seemed to be finished. The proof is not satisfactory. There is no evidence either as to the gift or the delivery, except the accountant's own testimony, and that, under the circumstances, is wholly incompetent on both of those heads.P.L. of 1880 p. 52; Smith v. Burnet, 7 Stew. Eq. 219;
affirmed on appeal, 8 Stew. Eq. 314. She was called as a witness in her own behalf on the subject, and although it does not appear by the record that objection was made to her testimony on the ground of incompetency, yet the court may and ought, itself, of its own motion, to reject it. In proceedings of this sort others besides the parties *Page 254 
litigant may be interested in the result, whose interests it is the duty of this court to protect against the result of unlawful testimony admitted without objection. In this case there is a minor not represented, who has an equal interest with the exceptant.
The court, by the decretal order, charges Mrs. Sherman with the amount of the Cook loan ($10,000) and the interest thereon from October 3d, 1876, up to which time she received interest thereon. She took the title to the property in March, 1878. It is admitted, as appears by an entry on the record, that Cook was then insolvent, and has been ever since. The property has not been sold, and it does not appear that the estate will sustain any loss by that investment. It is urged, on behalf of the respondent, that the investment was one which the court would not sanction; that the property was subject to a liability to a paramount lien of large amount for benefits for widening Belleville avenue, so that, in fact, the mortgage was not the first, but the second lien upon the premises. The assessment had not been made at the date of the mortgage, October 3d, 1873. It was ratified August 17th, 1874. The amount assessed on the premises was $8,923.11, and it was paid, presumably by Cook, two days afterwards. The assessment was subsequently set aside and the money refunded to Cook by the city in 1876. A new assessment was made, which was confirmed May 22d, 1880, over two years after the conveyance had been made to Mrs. Sherman. The amount then assessed upon the property was $2,602. Mrs. Sherman undoubtedly thought the premises were good security for the loan when it was made. They are shown to have been at that time of large value. One witness says they were then worth $25,000, and two others, one of them, at least, an expert in the value of real estate in Newark, $20,000. At the latter valuation there was an excess of value of about $7,000 over the encumbrances, putting down the assessment at $2,600. And at that time the mortgagor appears to have been abundantly able to remove the paramount lien of the assessment, and he did it at once, as soon as it was ratified, although, as appears by the reassessment, it was over three times as much as it ought to have been, and was the large sum of nearly $9,000. She appears to *Page 255 
have acted circumspectly in making the investment; to have taken advice of persons whom she regarded as competent judges of the value of the property before making the loan, and to have been satisfied that the investment was a safe one. She had legal counsel in the matter, also; and she acted under the advice of counsel in taking the conveyance in satisfaction of the debt after the mortgagor had become insolvent. There is no reason to doubt her bona fides in either transaction. If she acted in good faith, the fact that the premises were liable to a paramount lien would not of itself make her chargeable with the money lent. Perhaps the estate will meet no loss by the investment. If so, she will have incurred no liability. Where a trustee has made, as she did in the case of the Harrison loan, an investment wholly unallowable, and the money is lost, he is of course chargeable with the amount of the loan; but where an investment has been made on second mortgage and it has not been ascertained, and does not appear, that there will be a loss, the mere fact that it was an investment on second mortgage will not of itself make the trustee chargeable with the money. The prior encumbrance may be comparatively insignificant, or, if not, it may be of an amount not so large as to endanger the security. In any such case, where the trustee has acted in good faith, it must be ascertained that there will be a loss before the trustee can be called upon to answer for having made the investment. In this case the trustee has transferred the security (as she was bound to do) to her successor, and has lost all control over it. To charge her with the money invested is to assume that there will be a total loss (which would be an unwarrantable assumption), or that she has acted in bad faith, a conclusion not justified by the evidence. The question of her liability must be left to a later day, when it shall be known that the estate has sustained a loss, and to another tribunal.
It is urged, however, that it is proved that the trustee stipulated for and received a large premium on the loan for her own personal advantage, and that this of itself is evidence of bad faith in making the investment. If the fact were conceded, it not only would not establish bad faith, but it would be but *Page 256 
slight, if indeed it would be any evidence that she knew she was making a bad investment for the estate. The evidence in reference to the taking of the premium is extremely conflicting; but it is unnecessary to pass upon the weight of it. Mrs. Sherman testifies that she had of the money of the estate to put into this investment an amount a little less than $9,050, and that the balance of the $10,000 was made up of her own money; so that of the money of the estate there were only about $9,000 in fact invested. If the full amount due the estate on the investment shall be realized out of the property, the question will be of no importance. If she took the premium she has received only about $50 of the money of the estate for which she would be accountable on that head. There is another consideration of some weight against the action of the orphans court in this matter, which is deserving of mention. If it should turn out that the property is of greater value than the amount of the investment, the cestuisque trust are entitled to the benefit of it. It is necessary to await the disposition of the property by the trustee before the question of her liability can be properly and fairly dealt with. The orphans court had power to remove Mrs. Sherman, because she did not give bond when required, in view of her remarriage, and it had power to require her to turn over the trust estate to her successor, but it had not jurisdiction to order the latter, on her paying the amount charged against her in respect of the investment, to convey the property back to her or to sell it and credit her with the net proceeds. By the one hundred and twenty-second section of the orphans court act (Rev. p. 779), the orphans court has power, where a female trustee under a will has married, to remove her unless she and her husband shall give bond for the faithful performance by them of the trust reposed, and the true payment of all moneys of the estate which shall or have come into the hands of the trustee before her marriage, or shall be received by her or her husband after the marriage. The section provides that nothing therein contained shall be construed to release the husband and wife, or either of them, from any previous neglect, default or breach of trust, or from any liability to account as before the passing of the act. By the one hundred *Page 257 
and twenty-ninth section (Rev. p. 781) power is given to the court to appoint a successor to such removed trustee, and it is provided that such successor shall have power and authority to demand, receive and recover the property and assets of the estate, and to maintain all proper actions at law or in equity for the recovery thereof, by the next section it is provided that a trustee who shall have been removed or discharged under the act, shall immediately deliver over to his successor all goods and chattels, moneys and effects and other assets which he shall hold as trustee, and settle his account and pay the balance to his successor, as the circumstances of the case may require or the court order; and that the court may enforce obedience to its order by fine for the benefit of the estate. By the one hundred and thirty-first section (Rev. p. 782)
it is provided that the removal of the trustee shall not release or discharge him from liability for the estate or any part thereof which has been received, or which ought to have been received by him, or for any neglect, default, miscarriage or breach of trust in he execution of his office, and that his successor may have actions of trover, detinue, or in case, for such goods and chattels as shall have come to the possession of the removed trustee, and for any breach of trust, waste, embezzlement or misapplication thereof, and may proceed by actions at law or in equity for the recovery of the assets of the estate, either against the removed trustee or any other person into whose possession such assets shall have come or in whose hands they may be. The intention of the legislature was to give the court certain powers for the protection of certain trust estates. It is in such cases as this to require the trustee and her husband to give bond, and on their failure to do so to remove her; to compel her to deliver over to the new trustee the goods, chattels, moneys and effects, or other assets which she may hold as trustee, and to settle her account and pay the balance of her account when settled. The accountant has obeyed the order of the court, and has transferred the property to her successor. She is entitled to the allowance of the amount of the investment in her account, but her successor may bring the question of her liability in respect thereof to an adjudication in the court of chancery, which is the appropriate forum. It cannot, *Page 258 
for the reasons before given, be passed upon in these proceedings in the orphans court.
In the case of Hunt v. Mayberry, 5 Dutch. 403, it was said in reference to the nineteenth section of the act of 1855 (Rev.p. 778 § 118), that the design of the legislature was not to confer on the orphans court all the powers the court of chancery has over cases of administration, guardianship and trusts, but to give a new jurisdiction, or rather to enlarge the jurisdiction, over a class of persons already subject to the power of the court. So, in the legislation under consideration, the intention of the legislature was to confer certain powers, and certain powers only, on the orphans court, and not all the powers which the court of chancery would have over the subject.
So much of the order appealed from as charges the accountant with the amount of the Cook loan and interest, will be reversed, together with the direction to the trustee in connection therewith. So, also, will the award of costs. The accountant should, in the orphans court, pay only the costs of those of her exceptions to the master's report which were not sustained in the orphans court; the rest of the costs of the exceptions should be paid out of the estate. In all other respects the order will be affirmed. The accountant is entitled to costs of both appeals. *Page 527